UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES | 1:09cr089-01 |
| V. | (RWR) |
| GREGORY FAIR | |

SENTENCING MEMORANDUM ON LOSS

Gregory Fair, through undersigned counsel, respectfully submits the following material relevant to the question of the harm done by Mr. Fair in selling copyrighted, but outdated, software on E-Bay. Mr. Fair sees this material as relevant to the question of restitution, and to the question of length of sentence under the agreement and projected guidelines range.

One thrust of this memo is to assert the following.

- The gravity of economic crimes is normally equated to loss, both to the direct victim and society.
- Copyright violations use the concept of infringement amount as a measure of loss.
- As to software piracy, infringement amount may bear little or no relationship to loss, because piracy is often permitted as a strategy to increase profits.
- Therefore infringement amount may not be a fair way to punish, or set restitution, in cases of software piracy.
- There is some indication in this case that Adobe Systems allowed Mr. Fair's infringement to continue until it was no longer to its advantage, and then reported him.

*FACTS*

On April 16, 2009 Mr. Fair pled guilty to an information charging him with one count each of Mail Fraud and Copyright Infringement. The basic behavior charged was that Mr. Fair sold outdated, but usable Adobe software on line, and then mailed software disks to the buyers. In the accompanying plea agreement the parties agreed that the base guidelines range for these charges – 8 for copyright and 7 for mail fraud – should be

1

increased by 14 points because the infringement amount was between $400,000.00 and $1,000,000.00.  It appears to counsel that this calculation was based upon the amount of money taken in from sales of the software during a certain period of time.  (See: Commentary to 2B5.3, Application Note 2B, *Use of Retail Value of Infringing Item.*)  In the 2008 Guidelines Manual there is a background note to the Application Note which sets out that copyright violations are to be treated in a way similar to theft and fraud offenses, and that the sentences should 'reflect the nature and magnitude of the pecuniary harm caused…' (Pg. 125.)   The note appears to equate infringement amount with loss due to theft.  In fact, the schedule of points to be added under 2B5.3 is set out in 2B1.1(b)(1).  This section sets out amounts of 'loss' due to some economic offense such as theft.

Further, both the government, and the Adobe Systems representative ask for more than $767,000.00 in restitution from Mr. Fair.  This amount represents the gross receipts during the charged period.  (It is to be noted that Mr. Fair's actual profit was far less than this figure, due to expenses of the business.)

### *INFRINGEMENT AMOUNT CANNOT BE EQUATED TO LOSS*

An infringement amount cannot be directly equated with loss due to theft.  If a person steals one hundred dollars from a till, the loss to the store owner is exactly one hundred dollars.  This is a direct measure of harm.

But Gregory Fair's crime was to sell outdated software, which was nevertheless still copyright protected.  Basically he engaged in a form of software piracy.  Some research conducted by counsel reveals the basic fact that piracy of software, even piracy of current editions of software, is often tolerated, perhaps abetted, by copyright holders as

part of an economic strategy to increase profits. This proposition is not controversial, and there has been quite a bit of research by economists into the question of when a software maker should allow piracy. See: *A Network Effects Perspective on Software Piracy,* Katz, Ariel, 55 University of Toronto Law Journal, 155 (2005).

A short version of why this is so is as follows. Allowing piracy has the basic effect of spreading the use of the software. This may produce a network effect. The more widely a software is used, the more valuable it becomes, and so the higher the price that can be charged for it. Further, a user of software must spend time and intellect in learning how to use it. Once having done this, he is more likely to keep using the later versions, and spending money with the maker, not its rivals. Also, initial sales of the software are often encouraged by word of mouth by users of it. Piracy increases this effect by increasing the number of people using the software. And when a piece of software is widely used, competitors face a more difficult time introducing competing software.

Allowing piracy is also a way of establishing a price differential, so that different groups pay different amounts for the same product, without appearing to do this directly. If a maker issues new software at a price, say, of $600.00, a certain number of potential users will be willing to pay the price, partly in order to avoid breaking the law. (Governments, other institutions, and just people averse to risk.) By allowing easy piracy of the new product the maker at once gets a massive penetration into the market, but preserves a high profit for those units sold to those unwilling to buy a pirated version. Once a particular software has achieved a certain market position, it will no longer be to the advantage of the maker to allow easy piracy. The maker may then adopt a much

stricter approach to piracy, perhaps reporting it to authorities, encouraging high profile enforcement of the copyright laws to then discourage what had been useful.

Of course, the copyright holder cannot be widely seen as encouraging piracy, since that would tend to defeat the strategy. Thus, in this first period where they do little or nothing to protect the product, they also have to maintain that they are fighting piracy, and must publicly decry it. If they do not, if they admit the strategy, then the strategy fails. A person seldom goes into a store to buy a product that he can get free right outside the door, unless the 'free' product carries a risk with it.

There are well known examples of companies which explicitly adopt a strategy of giving away the product, although they may cloak it in rhetoric. Apple, as it was about to go under due to competition, adopted a program of giving away its computers in schools, thereby creating a pool of Apple customers of the future and saving itself. Microsoft, after years of trying to enforce its copyrights in China, adopted a program where piracy was allowed, thereby making its operating system the gold standard in China and creating a market where it dominates and profits. However, a normal strategy would be to hide the fact that the product can be had for much less.

As a hypothetical, assume that two companies both have a new software, and that they are equally cost effective when first introduced into the market. One, A, allows easy piracy. But B protects the product. Gradually, A's product becomes more widely used. Because of that, it is now more useful to the new buyers, since more people have it. A drives B's product out of the market. A raises prices, and adopts piracy protection.

A strategy of allowing piracy for commercial advantage may well be virtually mandated for commercial enterprises that have a duty to shareholders to maximize

4

profits. But it carries with it more than a hint of hypocrisy. You have to cry wolf, while feeding the wolf at the back door. And when the wolf is no longer useful, one day it comes to the back door and you shoot it.

*APPLICATION TO GREGORY FAIR'S CASE*

Mr. Fair's conduct in selling the Adobe software differed somewhat from a paradigm used by the economic models, in that he sold dated software, but provided the means to update the product. (As opposed to just copying the newest version and selling it.)

Mr. Fair never sold any software that was then being sold or supported by Adobe. All of his shipments were of software that was at least one generation old. None of it was then commercially available. However, once installed on a computer the user could then obtain up to date software by paying Adobe. The Adobe price for updates was less than if the user just bought the program new. So, a new Photoshop might cost $600.00. If a person spent $100.00 with Mr. Fair, he would then be able to spend, say, $200.00 with Adobe and get the same product that would have cost $600.00, new.

In order to install the software, the user needed a 13 digit number. This number was a form of copyright protection. Mr. Fair discovered that useable numbers were easily generated by use of an algorithm that was available free on the internet. He supplied a workable number with the software, and that allowed installation and updating.

A quick analysis of this conduct leads to some questions. First, apparently almost all of Mr. Fair's buyers were new to Adobe, else they would have no need for the product. It seems likely that many of them were 'test driving' the software to see if they

wanted to use it. (Adobe CEO Bruce Chizen: "In terms of the argument that piracy is good because it gets people to try out the software, that might be the case, but I sure would like to control that." SFGATE.com; 4/24/05 *Adobe Systems Inc. On the Record: Bruce Chizen.*)

Some buyers may not have liked the Adobe software, and so used software supplied by a competitor. Some buyers may have used the software, but never updated. But many buyers who liked the software would have updated, thus spending money with Adobe that may not have been spent without some form of piracy. Some portion of Mr. Fair's buyers may have sprung for the whole $600.00, if there were no piracy. But that figure is likely low. So, Mr. Fair's ultimate impact upon Adobe may well have been positive. This is true even without factoring in the full 'network effect' set out above, but just using total income as a measure. The question is what percentage of Mr. Fair's buyers were in each category.

The question cannot be answered by counsel, although Adobe likely has that sort of data.

Mr. Fair sets out the proposition that if Adobe was using software piracy as a commercial strategy during the time that Mr. Fair was illegally selling its products, then the court should take that into consideration at sentencing, and when considering restitution.

The question of whether Adobe was tolerating piracy for the products sold by Mr. Fair is a complex one, and the answer might well be regarded by Adobe as a secret. Nevertheless, there are some indications that Adobe was doing just that.

6

Adobe Systems did little or nothing to prevent piracy until 2002, when it changed the encryption algorithm from 13 to 24 numbers, in Photoshop 7.0. Nevertheless, users could reach the 7.0 software by buying versions 4.0-6.0 and upgrading, as described above. (Also, it appears that moving to 24 bit encryption did not significantly deter piracy. But Mr. Fair never attacked the 24 bit encryption.)

In 2003 Adobe adopted a bundling strategy, and changed all its encryption to 24 bit. It released Creative Suite 1, but allowed upgrades from Photoshop 5.0, 6.0. In 2005 Adobe released CS2, and allowed upgrades from Photoshop 6.0. But in late March of 2007 Adobe released CS3 and did not allow upgrades from Photoshop 6.0. This would likely have drastically reduced Mr. Fair's business, since he had not made his product compatible with an upgrade to the newest Adobe release. He did not sell Photoshop 7.0 with its 24 bit encryption. But, at the same time Adobe released CS3, it instituted prosecution of Mr. Fair. Maybe that was a coincidence, and maybe it wasn't.

It cannot be denied that it was Adobe, not the Postal Service, which initiated action against Mr. Fair. Without the report of Adobe, the Postal Service would have known nothing of Mr. Fair.

There is evidence that Adobe, itself, knew of Mr. Fair's activities for some time before they reported him to USPS. In January of 2006 one of Mr. Fair's very few dissatisfied customers reported him directly to Adobe Anti-Piracy Director Chris Stickle. This probably wasn't the first time this happened, and wasn't the last. It is the first time Mr. Fair knows about.

Prior to that, several of Mr. Fair's eBay auctions had been taken down by eBay through the Verified Rights Owner Program (VeRO) instituted by eBay to comply with

the 1998 Digital Millennium Act. These enforcement actions were not done directly by Adobe, but instead by industry watchdog and lobbying groups, partially funded by Adobe. Nevertheless, it appears that Adobe was aware of Mr. Fair's activities well before they reported him. Adobe has been a registered member of the VeRO program since 1998.

In short, Adobe never exercised its right to copyright protection against Mr. Fair under the eBay VeRO program, nor under 17 U.S.C. 512, until the early 2007 report to USPS, although indications are that Adobe knew about Mr. Fair's operations well before that.

The report to the USPS appears to coincide with a switch in Adobe piracy strategy, possibly related to the release of the new bundled software, not allowing upgrades. Once that decision was made, the income stream to Adobe from Mr. Fair's sort of activity would cease. That would make him more of a direct competitor, and not as useful a pirate. He may then have been of greater use to Adobe as a public example in the anti-piracy campaign. Since he did not copy and sell CS3 or CS3 compatible software, his activity could not contribute any longer to the network effect to the upgrade stream of revenue, nor to differential pricing of the new software. Time to shoot the wolf.

The Katz article cited above is a lengthy, but comparatively clear, exploration of the potential moves in a strategy of allowing easy piracy of software. In a section entitled <u>Exploiting lock-in to increase revenue</u> (171-175), Katz sets out an analysis of a further step in an *ex post facto* enforcement strategy. The software maker can maximize profits by allowing infringement until it no longer suits his purpose, then turn on the infringers

and extract a penalty from them.  That is, the maker can then try to get the most out of the infringer, using the fact of civil and criminal penalties as leverage.  (Katz's analysis focuses upon institutional infringers.)  Such a strategy allows the maker to obtain from the infringer more than might have been obtained had they bargained at the outset for a license to the software, largely due to the legal penalties faced by the infringer.

Mr. Fair is not an institution, and so does not offer Adobe the chance to make money by converting his infringement into a license arrangement.  To maximize profit in dealing with people such as Mr. Fair, Adobe's strategy would, therefore, differ.  Indeed, it may look much like just what has happened.  Adobe turns in the infringer, who gets arrested and has his assets seized.  Adobe incurs no cost in the ensuing investigation, because the government bears the cost.  Adobe then asks for its money back, either by making a claim for the seized assets or by asking for restitution.  Whatever money it obtains thereby adds to the plus side of the balance sheet.

In fact Adobe made a claim with USPS for the assets seized from Mr. Fair. At this time neither party knows much detail about this claim.  It appears as if they asked for all of it but got only twenty four thousand dollars.  They also asked for over $767,000.00 in restitution.

No use letting that dead wolf rot outside the door.  Skin it and sell the pelt.

### *MR. FAIR'S BELIEF THAT ADOBE WOULDN'T ENFORCE*

It may be argued that, apart from the issue of harm to Adobe, Mr. Fair's conduct was what it was, and constituted a type of theft.  This would be an approach focusing upon his knowing and systematic breaking of the copyright laws for his own profit.  Indeed, once the confusion between 'infringement amount' and 'loss' is cleared up, the

focus on the amount of money Mr. Fair took in, as the major sentencing factor, can be seen as simply a focus upon his own guilty conduct, divorced from the harm it may have done, if any.  This is not an irrational approach, although perhaps not what the guidelines intended.  It could be reasoned that a person who is willing systematically to break the law for profit is a danger to society, even if what he did ultimately harmed no one.

In order to analyze this aspect of the situation, Mr. Fair offers a hypothetical.  Suppose a daffodil thief comes into a garden where twenty bunches of daffodils grow, one fall day.  He wants some bulbs, and this gardener seems to have many of them.  The thief knows that daffodil bunches must be split in the fall, else they may not grow next spring.  He digs up a clump, splits it and takes for himself half of the clump of bulbs.  As he drops these into his sack, he becomes aware that the gardener has seen him and is looking right at him from the house nearby.  But the gardener does not cry out, or complain.  So the thief digs and splits the next clump, taking half for himself.  The gardener watches, but does not stop him.  Another clump follows, and another, with no complaint, until he is just finishing the last of the twenty clumps.  Then the gardener calls the police, who come, arrest the thief and give the dug clumps back to the gardener.  If the thief intended to walk away with only the first split, until he saw that the gardener apparently didn't mind, what is the true extent of his culpability for the other nineteen splits?

Mr. Fair began his working life at age fourteen, spent six years in the army, and in 1988 began to work for various telecommunications companies.  In 2001 Mr. Fair was laid off from Nortel Networks, where he had been making a six figure salary.  Many other Nortel employees were also fired, as a result of the dot.com crash.  Mr. Fair found

himself unemployed and without funds. In 2002, Mr. Fair began to sell his possessions on eBay, including items such as golf clubs. He also put up for sale some of his software, including Corel Draw 8, and Adobe Photoshop 4.0 and Illustrator 8.0. This action was legal. The Corel product was immediately removed from eBay under the VeRO program. The Adobe software was not removed. Mr. Fair began getting inquiries from potential buyers as to the authenticity of the Adobe software. Mr. Fair investigated the situation, because he could see that a large quantity of obviously duplicated software was being offered for sale each day on eBay. He noticed that software from Corel, Norton, and Quark, for instance, was quickly removed from the site. But Adobe listings were allowed to continue. In fact, of the illicit software for sale on eBay, Adobe Photoshop was the most pervasive.

Based upon an inquiry from a potential buyer, Mr. Fair discovered that there was a site that generated numbers which would allow installation of copied Adobe software on a computer. Mr. Fair had a background in encryption and technology. He experimented and found that the 'keygen' numbers all worked to install his own Adobe software. (And so would work on copies of same.)

Mr. Fair did further internet research and concluded that the reason so much copied Adobe software was available on eBay was that Adobe allowed it. Adobe's retail price was tailored to institutional buyers. They then allowed low cost or free distribution of the software through piracy, and then allowed the illegal software to update as if it were legitimate. The strategy was, he thought, aimed at getting college students to use the software, then take it with them when they got jobs, influencing the employer to buy the high priced version.

So Mr. Fair, with no prospects in sight, began to sell copies on eBay. Throughout much of the time when this was his livelihood, Mr. Fair was aware that his activity was being monitored by someone. His assumption, correct or not, was that Adobe knew of his activity and was tolerating it, since it fit into a business model that allowed them to capture buyers of upgrades who would not have bought the full priced product.

That assumption was not at all unreasonable, and Mr. Fair acted on it. He began to operate what he regarded as a grey market business, and he did it relatively openly. He streamlined production, lowering costs, and multiplied the eBay accounts to maximize profit. Because he thought Adobe, unlike other software companies, would tolerate the sale of old software, he sold only Adobe software.

He did not make false claims about the authenticity of his software to get sales. The package he shipped was obviously not an officially issued version, and did not purport to be so. When a buyer complained that the product wasn't authentic, he refunded them the money, but did not have them send the product back. His user IDs on eBay were all highly rated by the consumers. Over time it became obvious to him that his customers mostly knew that they were buying grey market software. As a rule, they didn't seem to care, as long as it worked and could be upgraded.

Further, other than Adobe getting upgrade customers and network effects, eBay, Paypal and UPS also profited from his business. (Approximate figures from 2005 to 2007: eBay = $45,890; Paypal = $26,782; UPS; $241,040: Total $313,713.)

In the years 2006 and 2007 the landscape surrounding grey market software sales changed. Software industry advocacy groups became more aggressive in battling internet software piracy. They engaged in a public battle with eBay, accusing eBay of allowing

12

software piracy on its web site. When eBay's response did not satisfy them, they began to act against individual sellers on eBay. In 2007 one group removed 3 sets of Mr. Fair's Adobe listings from eBay. In 2008 another group removed four. However, Adobe never complained, nor removed any of Mr. Fair's auctions.

Finally, as mentioned above, in late March of 2007 Adobe released CS3, and the literature that came with it indicated, accurately, that it could not be updated from any of Mr. Fair's products. Mr. Fair bought the new software to check that. Coincident to this, Adobe reported him to the USPS, and their investigation began.

Between the time of his initial infringement in 2001 and the raid on his house in March of 2008, Mr. Fair progressed from a single man to a married man with responsibility for four minor children. After the raid, Mr. Fair's on line sales income continued automatically because he had no access to the accounts. When he regained access he returned all the money that had accumulated, over $7,000.00.

Contrary to the claim made by Mr. Stickle of Adobe in the pre-sentence report, Mr. Fair did no harm to his customers. He delivered the product they sought, in a form that allowed them to use it as if it were the original. (And it cost them much less.) His eBay customer satisfaction rating was at or near 100% for all his sites.

The experience of being responsible for a family has impacted Mr. Fair in a positive way. He has begun a new, legal, business called UniformDisplay.com, which sells award display cases. (This is a nascent business which will falter without him.) Mr. Fair began this business in 2006, well before the raid on his house.

*CONCLUSION*

In fashioning a sentence and restitution in this case Gregory Fair asks that the court take into account the above outlined possibility that his conduct did no harm, and that he reasonably believed that it was being permitted by Adobe Systems.

Respectfully submitted,

///TTH\\\

Thomas T. Heslep
419 7th Street, NW, #401
Washington, D.C. 20004
Tel 202-628-0293
Bar no. 351726

Service:  Via ECF, 8/21/09; and via e-mail to AUSA Marc Miller at
Marc.Miller@usdoj.gov.

TTH